**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-60191-CIV-XXXX**

PERDUE PREMIUM MEAT COMPANY, INC.
d/b/a NIMAN RANCH

    *Plaintiff*,

v.

CO LINES, INC.

    *Defendant.*
_____/

**COMPLAINT**

Plaintiff Perdue Premium Meat Company, Inc. d/b/a Niman Ranch ("Niman Ranch") brings this Complaint against Co Lines, Inc. ("Co Lines") under the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 14706 (the "Carmack Amendment").

**Introduction**

1.    The Carmack Amendment provides a national, uniform framework that governs interstate carriers' liability for property loss. Here, Co Lines failed to maintain appropriate and agreed-upon temperatures during its transportation of Niman Ranch's meat products to Florida, causing the products to spoil. Niman Ranch sues Co Lines for its resulting losses.

**The Parties**

2.    Niman Ranch is a California corporation that has its headquarters in Salisbury, Maryland and its principal place of business in Westminster, Colorado. Niman Ranch and its network of family farmers raise livestock humanely and sustainably and process and ship naturally

raised beef, pork, poultry, and lamb to supermarkets, specialty retailers, foodservice distributors, and restaurants across the United States.

3. Upon information and belief, Co Lines is an Illinois corporation that has its principal place of business and headquarters in Westmont, Illinois. Co Lines is a transportation and shipping company.

## Jurisdiction and Venue

4. The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. The Court also has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1337(a) because it is brought under 49 U.S.C. § 14706, and the amount in controversy exceeds $10,000, exclusive of interests and costs. Finally, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because this is a civil action where the amount in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states.

5. The Court has personal jurisdiction over Co Lines because: (a) Co Lines conducted or engaged in business in Florida and breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida; and (b) Niman Ranch's claims against Co Lines arise out of or relate to Co Lines' failure to deliver meat products in good condition in Florida, Co Lines purposefully availed itself of the privilege of conducting activities in Florida by agreeing to deliver meat products to Florida and failing to deliver those meat products in good condition in Florida, and the exercise of personal jurisdiction over Co Lines comports with traditional notions of fair play and substantial justice.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this case occurred in this judicial district. Venue also is

proper in this Court under 49 U.S.C. § 14706(d)(2) because the loss or damages at issue in this case is alleged to have occurred in this judicial district.

## The Facts

7. On or about September 17, 2020, Whole Foods–Florida ("Whole Foods") placed an order for certain beef products (the "Florida Products") with Niman Ranch. Whole Foods agreed to pay Niman Ranch approximately $258,789.29 for the Florida Products.

8. Upon information and belief Whole Foods strictly adheres to basic government guidelines regarding food safety, which include not allowing refrigerated meat products to sit for over two hours in the 40° - 140° Fahrenheit temperature range. At this temperature range bacteria dangerous to human beings grows most rapidly and can double in as little as twenty minutes.

9. On September 24, 2020, Niman Ranch contracted with K&M Logistics ("K&M") to ship the Florida Products from a cold storage facility in Lincoln, Nebraska operated by Universal Pure ("Universal") to a Whole Foods location in Pompano Beach, Florida. This contract was memorialized in Bill of Lading W0-547011, which attached hereto as Exhibit 1 (the "Bill of Lading").

10. As set forth in the Bill of Lading, the Florida Products had to be shipped in a refrigerated trailer precooled to 26° Fahrenheit. Additionally, the Bill of Lading specifies that the trailer in which the Products were to be shipped had to be maintained at 26° Fahrenheit.

11. After contracting with Niman Ranch, K&M in turn contracted or made other arrangements with Co Lines pursuant to which Co Lines would be the actual carrier delivering the Florida Products from Universal to the Whole Foods location in Pompano Beach.

12. On or about September 21, 2020, Niman Ranch delivered animals to JBS Foods USA ("JBS") for processing. There, the animals were slaughtered and the carcasses were placed

in a chill cooler to bring their temperature to 40° Fahrenheit or below. After chilling, the carcasses were fabricated into meat cuts, packaged, and labeled. The resulting Niman Ranch meat products were stored at temperatures below 40° Fahrenheit.

13. JBS strictly adheres to all government food and safety regulations and guidelines, including regulations and guidelines concerning the storage and shipment of meat products. In fact, the United States Department of Agriculture's Food Safety and Inspection Service inspects every JBS facility on a daily basis to ensure its products meet federal safety standards.

14. On September 23, 2020 and September 24, 2020, JBS delivered Niman Ranch's meat products to Universal (the "Universal Shipment") for storage pending pick up and shipment by carriers to Niman Ranch's customers. The Florida Products were included within the Universal Shipment.

15. Universal strictly adheres to all government food and safety regulations and guidelines, including regulations and guidelines concerning the storage of meat products. Universal records demonstrate that JBS delivered the Universal Shipment in containers with temperatures below 40° Fahrenheit, and that the temperature of the dock where the Universal Shipment was unloaded also was below 40° Fahrenheit.

16. On September 25, 2020, Co Lines picked up the Florida Products from Universal for shipment to the Whole Foods location in Pompano Beach.

17. Universal records concerning the pick up demonstrate that the temperature of the dock where the Florida Products were transferred to Co-Lines was below 40° Fahrenheit. Universal records further show that the Co-Line truck into which the Florida Products were loaded had a temperature at the time of loading well below 40° Fahrenheit

18. Co Lines delivered the Florida Products to the Whole Foods location in Pompano Beach, Florida on September 29, 2020.

19. Upon delivery, Whole Foods inspected the Florida Products. Whole Foods determined that the temperature of the Florida Products was above 40° Fahrenheit.

20. Whole Foods also obtained a time and temperature summary record concerning the internal temperature of the trailer Co Lines used to ship the Florida Products. That record demonstrated that the internal temperature of the trailer remained well above 40° Fahrenheit for the three days prior to delivery—time during which Co Lines was transporting the Florida Products to Whole Foods. Co Lines thus failed to comply with its obligation to keep its trailer containing the Florida Products at or below 26° Fahrenheit.

21. As a result of Co Lines' improper handling and transport and failure to maintain the Florida Products at the required temperature, the Florida Products arrived adulterated, damaged, and unfit for delivery to Whole Foods-Florida.

22. On September 29, 2020, a Whole Foods employee sent an e-mail to Niman Ranch stating:

> We have been notified by the Florida DC that PO# 9901076663 [the Florida Products] arrived out of temp and had been out of temp for the past 3 days. All pulping internal temperatures show above 41. With this information in mind, we will need to reject the load. I will advise the DC to enter for full credit.
>
> This PO includes all items we are in need of-Chucks, Exports, Striploins, Top Butts, Short Ribs, and Thins. I will need to significantly adjust my order for delivery 10/6 by diverting these items from my initial Midwest order. I will send over as soon as possible.
>
> Please follow up with us regarding an action plan to avoid this from happening in the future as it will certainly disrupt the supply in the Florida and Midwest regions.

5

23. Upon information and belief, Whole Foods rejected the Florida Products because they sat for over two hours in the 40° - 140° Fahrenheit temperature range and thus Whole Foods could not sell them to its customers. Because they could not be sold, the Florida Products were worthless to Whole Foods.

24. Niman Ranch filled orders placed by Whole Foods locations in Illinois and Connecticut with meat products selected from the Universal Shipment (*i.e.*, the same source from which the Florida Products were selected). These Whole Foods locations accepted the meat products they received without incident or complaint. These meat products were shipped by carriers other than Co Lines.

25. After Whole Foods rejected the Florida Products, Co Lines took the Florida Products to a cold storage facility in Florida. Co Lines did so without notifying Niman Ranch, obtaining Niman Ranch's consent, or seeking guidance from Niman Ranch regarding how it wished to handle the rejected Florida Products.

26. In an effort to mitigate its damages, Niman Ranch reasonably and expeditiously pursued resale of the Florida Products. Eventually, Niman Ranch was able to resell the Florida Products to a salvage buyer. The salvage buyer, however, only paid Niman Ranch a total of $24,000.00 for the Florida Products. Additionally, as a result of Co Lines unilateral decision to take the rejected Florida Products to a cold storage facility of its choosing, Niman Ranch incurred storage fees of $1,680.00.

27. Niman Ranch has thus suffered $236,469.29 in damages as a result of Co Lines' actions.

## Count I
### Interstate Commerce Commission Termination Act of 1995
### 49 U.S.C. § 14706

28. The above paragraphs are incorporated by reference as if set forth in full herein.

29. The Carmack Amendment provides a cause of action for persons damaged by the actions of a transportation carrier in interstate commerce. To establish its case, a plaintiff must show: (1) delivery of goods to the carrier in good condition; (2) damage of the goods before delivery to their final destination; and (3) the amount of damages.

30. The Florida Products were delivered to Co Lines in good condition at origin. Niman Ranch, through JBS, delivered the Florida Products in good condition to Universal. Specifically, the Florida Products were at or below 40° Fahrenheit when delivered to Universal.

31. Universal kept the Florida Products stored at temperatures below 40° Fahrenheit while the Florida Products remained at Universal. The Florida Products thus remained in good condition—at or below 40° Fahrenheit—at Universal.

32. The Florida Products were in good condition—at or below 40° Fahrenheit—when they were loaded onto Co Lines' truck at Universal.

33. The Florida Products were damaged when they arrived in Co Lines' truck at Whole Foods in Pompano Beach, Florida. Specifically, when Whole Foods inspected the Florida Products, the temperature of the Florida Products was above 40° Fahrenheit. Additionally, the temperature readings of Co Lines' trailer showed that the internal temperature of the trailer remained well above 40° Fahrenheit for the three days prior to delivery—time during which Co Lines was transporting the Florida Products to Whole Foods from Universal.

34. As a result of Co Lines' improper handling and transport and failure to maintain the Florida Products at the required temperature, the Florida Products arrived adulterated,

damaged, and unfit for delivery to Whole Foods. Whole Foods rejected the Florida Products due to their improper temperature, which prevented Whole Foods from selling the Florida Products to its customers and made the Florida Products worthless to Whole Foods.

35. Despite reasonable and appropriate efforts to mitigate damages, Niman Ranch has suffered actual loss and damages totaling $236,469.29.

## **Prayer for Relief**

WHEREFORE, Niman Ranch respectfully requests that the Court enter judgment in its favor and against Co Lines and award Niman Ranch the following relief:

(a) Actual damages caused by Co Lines' actions in an amount to be proven at trial, which total at least $236,469.29;

(b) Pre-judgment and post-judgment interest;

(c) Costs of this proceeding; and

(d) All other relief as may be necessary and proper.

## **Jury Trial Demand**

Plaintiff demands trial by jury on all issues so triable.

Dated January 26, 2022

Respectfully submitted,

By: /s/ Derick R. Vollrath
DERICK R. VOLLRATH
Florida Bar No. 126740
dvollrath@mnrlawfirm.com
**MARCUS NEIMAN RASHBAUM
& PINEIRO LLP**
100 Southeast Third Avenue., Suite 805
Fort Lauderdale, Florida 33394
Telephone (954) 462-1200
Facsimile: (954) 688-2492
*Attorneys for Plaintiff*

By: /s/ Strider L. Dickson
RICHARD A. DeTAR
rdetar@mdswlaw.com
STRIDER L. DICKSON
sdickson@mdswlaw.com
(PHV Admission Forthcoming)
**McALLISTER, DeTAR,, SHOWALTER
& WALKER LLC**
100 North West Street
Easton, Maryland 21601
Phone: (410) 820-0222
Facsimile: (410) 648-4746
*Attorneys for Plaintiff*